IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) Criminal Action No. 22-129 (MN) |
| AMIR WATTS, | ) |
| | ) |
| Defendant. | ) |

**<u>MEMORANDUM OPINION</u>**

Shannon T. Hanson, Acting United States Attorney, Claudia L. Pare, Assistant United States Attorney, Wilmington, DE – Attorneys for United States of America

Eleni Kousoulis, Federal Public Defender, David L. Pugh, Assistant Federal Public Defender, Wilmington, DE – Attorneys for Amir Watts

March 12, 2025
Wilmington, Delaware



**NOREIKA, U.S. DISTRICT JUDGE**

Presently before the Court is Defendant's Motion to Suppress Evidence, which seeks to exclude evidence of crystal methamphetamine and other controlled substances collected from Defendant's truck following his arrest ("the Motion"). (D.I. 45). The Court will DENY the Motion for the reasons set forth below.

## I. BACKGROUND

### A. Introduction

On November 21, 2022, the Government charged Defendant Amir Watts by criminal complaint with intent to distribute or possess a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C). (D.I. 2). The next day, Defendant was intercepted and arrested on his way to sell crystal methamphetamine ("crystal meth") to an undercover officer of the Delaware State Police ("DSP"). On December 15, 2022, the grand jury returned an indictment for possession with intent to distribute, as well as felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(8). (D.I. 14 at 1).

Defendant filed the present Motion to Suppress on September 18, 2024. (*Id.*). The Government responded on October 19, 2024. (D.I. 46). Defendant replied on November 20, 2024. (D.I. 49). On January 29, 2025, the Court held an evidentiary hearing ("the Evidentiary Hearing"). (D.I. 60 ("Tr.")).

### B. The Evidentiary Hearing

At the Evidentiary Hearing, the Government called two witnesses: the Delaware State Police trooper who served as the undercover officer in this investigation ("the Undercover Agent"), and a Drug Enforcement Agency Special Agent present at Defendant's arrest ("the DEA Agent"). In addition, the Government entered documentary evidence into the record, including video recordings of the arranged drug buys (GX 2, 3, 5-8), GPS tracking data from Defendant's car on

1

the day of his arrest (GX 12), and phone and text message records of communications between Defendant and the Undercover Agent on the days before and the day of the arrest (GX 27, 28, 30-32). Defendant's counsel cross-examined both witnesses, objected to certain evidence, and had the opportunity to challenge other evidence. (*See generally* Tr.). Upon consideration of all of the above, the Court finds the testimony provided by the Undercover and DEA Agents to be credible.

### C. The Investigation

In July 2022, the DSP learned from a confidential informant that Defendant was selling large amounts of crystal meth in the Hartly area, operating under the name "Crystal." (Tr. at 7:2-8:18). The Undercover Agent initiated contact with Defendant by phone later that month. (*Id.*; GX 1). Between August and October 2022, the Undercover Agent arranged for a series of six meetings with Defendant to purchase meth. (Tr. at 11:14-25; GX 1). These buys took place on August 16, September 2, September 6, September 13, September 22, and October 20, 2022. (Tr. at 11:14-25; GX 1-3, 5-7).

At the first, second, and third meetings, Defendant sold the Undercover Agent one, two, and four ounces of crystal meth for $400, $700, and $1,400, respectively. (Tr. at 12:4-9; GX 1, 2, 3, 5). At the fourth meeting, on September 13, 2022, Defendant sold the Undercover Agent a handgun, some magazines, and ammunition for $1,000. (Tr. at 34:4-10, 36:19-37:5; GX 6). At the fifth meeting, on September 22, Defendant sold the Undercover Agent five ounces of meth for $1,900. (Tr. at 38:11-17; GX 7). At the sixth meeting, on October 20, the Undercover Agent bought one pound of crystal meth from Defendant for $4,000. (Tr. at 42:14-19; GX 8).

After each of the transactions, DSP conducted a field test to confirm that the purchased substance was in fact crystal meth. (Tr. at 22:7-15, 29:3-8, 33:15-18, 41:12-16, 44:25-45:3, 66:12-21; GX 1). Each time, the testing confirmed that it was. (*Id.*). Defendant drove the same white Chevrolet Silverado pickup truck to each meeting. (Tr. at 13:10-20; GX 1). When they ran the

Chevy's license plate number in their system in August 2022, law enforcement learned that the truck was owned by Defendant. (Tr. at 9:22-10:11; GX 1). After the September 2 meeting, the DEA became involved in the investigation. (Tr. at 18:22-19:10; GX 10). The Undercover Agent used an audio and video recording device to capture each of the third, fourth, fifth, and sixth meetings. (*See* GX 2, 3, 5-8).

### D.  The Arrest, Search, and Seizure

After six arranged drug buys, the DSP and DEA determined to set up a final meeting with Defendant for the purpose of arresting him. (Tr. at 57:6-20; GX 10). On November 20 and 21, the Undercover Agent and Defendant exchanged text messages and calls in order to confirm a meeting. (GX 27, 28, 30-32). They agreed to meet on November 22, in the late afternoon, so that Defendant could sell the Undercover Agent two pounds of crystal meth for $8,000. (Tr. at 45:8-20; GX 10). The arranged meeting place was the Royal Farms gas station in Hartly, Delaware. (Tr. at 45:8-20; GX 10).

The day of the arranged buy, DSP and DEA tracked Defendant's movements using a GPS device that had been placed on the Chevy Silverado pursuant to a validly issued warrant. (Tr. at 57:13-18, 80:25-81:13; GX12). Defendant started the day in Philadelphia, Pennsylvania, where law enforcement believed he lived and had his main supplier. (Tr. at 14:10-15; GX 12). He drove across the state line into Delaware, upon which agents began to tail Defendant's truck. (Tr. at 82:19-83:14; GX 10). They followed Defendant to Dover, where he pulled into the parking lot of an Advance Auto Parts store. (Tr. at 84:1-12; GX 10). After parking, Defendant got out of his truck, closed the door, and was standing outside the vehicle. (Tr. at 58:7-13; GX 10). At that point, law enforcement arrested him and his girlfriend, who was seated in the truck at the time. (Tr. at 58:7-13; GX 10). They seized the Chevy, took it to a nearby DSP station, and proceeded to search it, without obtaining a warrant. (Tr. at 61:6-19; GX 10). As a result of the search, DSP

found approximately two pounds of crystal meth, as well as smaller quantities of heroin, fentanyl, and cocaine. (Tr. at 61:20-62:19, 84:13-19; GX 10). DSP also found about 105 grams of marijuana in Defendant's pants pocket. (GX 10).

## II. LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Generally, for a search or seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based upon probable cause." *United States v. Bey*, 911 F.3d 139, 144-45 (3d Cir. 2018); *United States v. Amos*, 88 F.4th 446, 451 (3d Cir. 2023). Evidence obtained from an unreasonable search or seizure, or without a warrant, must be suppressed. *See United States v. Jackson*, 120 F.4th 1210, 1218 (3d Cir. 2024); *United States v. Caesar*, 2 F.4th 160, 167 (3d Cir. 2021).

A warrantless search or seizure is permissible, however, under limited circumstances. *See, e.g.*, *Arizona v. Gant*, 556 U.S. 332, 347 (2009); *Bey*, 911 F.3d at 145. One such condition is the "automobile exception," which "permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)). That the "automobile exception" has a "broad sweep" and has been read "expansively" by the Supreme Court has led the Third Circuit to opine that "it is difficult to pick a worse place to conceal evidence of a crime than an automobile." *United States v. Donahue*, 764 F.3d 293, 295, 300 (3d Cir. 2014). "While a seizure or search of property without a warrant ordinarily requires a showing of both probable cause and exigent circumstances, the 'ready mobility' of automobiles permits their search based only on probable cause." *Burton*, 288 F.3d at 100; *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999).

Probable cause is determined "from the standpoint of an objectively reasonable police officer" in light of the totality of the circumstances known to that officer at the time the search was conducted. *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). "The government bears the burden of establishing the applicability of the exception, by a preponderance of the evidence." *Donahue*, 764 F.3d at 300 (citing *United States v. Herrold*, 962 F.2d 1131, 1143 (3d Cir. 1992)).

In the automobile context, moreover, "probable cause does not dissipate after the automobile is immobilized because the exception does not include an exigency component. As a result, the government can search an impounded vehicle without a warrant even though it has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search." *Donahue*, 764 F.3d at 300 (citing *Maryland v. Dyson*, 527 U.S. at 466).

### III. DISCUSSION

Defendant argues that the Government's warrantless search of his truck on November 22 was unconstitutional because it lacked probable cause. (D.I. 45 at 1). As a result, Defendant asserts, the Court should suppress the drug evidence seized in the search. (*Id.*). The Court disagrees. The testimony and evidence presented at the Evidentiary Hearing sufficiently established the existence of probable cause that the Chevy Silverado contained drugs intended to be sold in a transaction later that day.

First, the Undercover Agent testified that, on November 21, he had arranged a drug purchase with Defendant for two pounds of crystal meth for the following day, November 22. (Tr. at 51:22-52:23). That testimony was corroborated by text messages between Defendant and the Undercover Agent, as well as photos of the Agent's iPhone call log. (GX 10, 27, 28, 30-32).

The purpose of the scheduled buy was to apprehend Defendant; that is, unlike the six prior instances, the Undercover Agent did not intend to complete the transaction. (Tr. at 57:6-11; GX 10).

The following day, November 22, Delaware State Police tailed Defendant as he entered the state, driving south from Pennsylvania. (Tr. at 83:1-11; GX 10, 12). He was driving the same white Chevy Silverado that the Undercover Agent had observed him driving at each of the previous meetings. (Tr. at 82:9-24; GX 1, 10, 12). A GPS tracker lawfully installed on the Silverado showed that Defendant drove to Delaware that day from Philadelphia. (Tr. at 82:9-83:11; GX 10, 12). According to testimony from the Undercover Agent, Defendant's main supply of crystal meth was located in Philadelphia, where Defendant also lived at the time. (Tr. at 28:23-29:2). Defendant stopped in a parking lot in Dover, which is on the way to Hartly, the location where the scheduled buy was supposed to take place. (*Id.* at 58:3-13, 84:1-12). Thus, when DPS arrested Defendant in the Dover parking lot, they did so having reasonably concluded that he was transporting two pounds of crystal meth from his source of supply in Philadelphia to the site of the arranged sale in Hartly. (*Id.* at 61:6-62:19). Indeed, based on the evidence, an objectively reasonable officer had cause to conclude that there was crystal meth in the truck, and, therefore, "probable cause exist[ed] to believe it contain[ed] contraband." *Burton*, 288 F.3d at 100; *Labron*, 518 U.S. at 940.

Defendant argues that there was no probable cause because his activity on November 22 did not precisely match his prior pattern of conduct in the previously arranged sales to the Undercover Agent. (D.I. 45 at 6-7). According to Defendant, this means that there was no reason to believe that he was carrying drugs in his car when he was arrested that day. (*Id.*). That, however, is refuted by the evidence, because Defendant repeated many elements of his previous pattern. For

6

example, he drove the same truck (the Chevy Silverado), to sell the same substance (crystal meth), at the same rate ($4,000/pound), at the same exchange location (a Royal Farms gas station), in the same geographic area (Hartly).

Thus, "the significant accumulation of evidence supporting a drug transaction justified a reasonable inference that a felony was being committed." *Burton*, 288 F.3d at 99. "From the perspective of an experienced law enforcement officer, or indeed from the perspective of any reasonably prudent observant of these activities, it was evident that [Defendant] was involved in a drug transaction." *Id*. Since "there was a 'fair probability that contraband or evidence of a crime' would have been found, there was probable cause for the search." *Donahue*, 764 F.3d at 301 (quoting *Gates*, 462 U.S. at 238).

Not to mention, there is no limitation in the case law suggesting that probable cause must be connected to a specific pattern of conduct. Rather, probable cause is a "totality of the circumstances" inquiry. *Donahue*, 764 F.3d at 301; *United States v. Harrison*, No. 17-59 (GMS), 2018 WL 1325777, at *2 (D. Del. Mar. 15, 2018). And for good reason. There are numerous plausible reasons why a drug dealer would alter his pattern from sale to sale. Perhaps he wanted to evade law enforcement or minimize the predictability of his scheme. Here, in fact, Defendant was en route to selling the Undercover Agent two pounds of crystal meth – a substantial quantity that could reasonably have required Defendant to come straight from his main supplier in Philadelphia, rather than a stash house elsewhere in Delaware. (*See* Tr. at 14:10-15, 35:5-12).

Accordingly, the Court finds that the Government had probable cause to believe that Defendant's Chevy Silverado contained drugs intended to be sold in a transaction later that day. Law enforcement was therefore entitled to search Defendant's truck and seize its contents under the automobile exception, and Defendant's Motion to Suppress is denied.

**IV.    CONCLUSION**

For the foregoing reasons, the Court finds that the evidence seized from Defendant's truck is admissible and, therefore, Defendant's Motion to Suppress (D.I. 45) is DENIED. An appropriate order will issue.